**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **NORFOLK SOUTHERN RAILWAY COMPANY,**<br>**Plaintiff,**<br><br>**v.**<br><br>**GWSI, INC.,**<br>**Defendant/Third-Party Plaintiff,**<br><br>**v.**<br><br>**THE MORNING STAR COMPANY,**<br>**Third-Party Defendant/ Counterclaimant.** | **CIVIL ACTION**<br><br><br>**NO. 25-1391** |

# <u>MEMORANDUM OPINION</u>

Plaintiff Norfolk Southern Railway Company ("Norfolk") brought this action to recover demurrage charges[1] arising from railcars that allegedly remained at GWSI, Inc.'s ("GWSI") warehouse longer than permitted. The Morning Star Company ("Morning Star") had contracted with GWSI to receive tomato products shipped by rail to GWSI's warehouse. Norfolk delivered the railcars carrying those goods to GWSI for unloading. According to Norfolk, GWSI took too long to unload and return the railcars, causing more than $365,000 in demurrage charges to accrue.

[1] A demurrage charge is "a charge that both compensates rail carriers for the expenses incurred when rail cars are detained beyond a specified period of time (i.e., free time) for loading or unloading, and serves as a penalty for undue car detention to encourage the efficient use of rail cars in the rail network." 49 C.F.R. § 1333.1.

GWSI has impleaded Morning Star, alleging that its contract with Morning Star renders Morning Star responsible for those charges. Morning Star previously moved to dismiss GWSI's Third-Party Complaint, but the Court denied that motion. *See Norfolk S. Ry. Co. v. GWSI, Inc.*, 2026 WL 932981, at *4 (E.D. Pa. Apr. 7, 2026). Morning Star, in turn, asserted counterclaims against GWSI for breach of contract, tortious interference with contract, and conversion. Presently before the Court is GWSI's motion to dismiss Morning Star's counterclaims made pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons that follow, the motion will be granted.

## I. FACTUAL BACKGROUND

From approximately February through August 2024, Norfolk released railcars to GWSI for loading or unloading at GWSI's warehouse facility. GWSI is a "warehouseman"—a third-party intermediary that receives, transloads, and stores its customers' goods. Norfolk and other rail carriers transport goods to and from GWSI's warehouses, where GWSI loads and unloads the railcars and handles the goods they contain.

According to Norfolk, GWSI failed to timely return possession of certain railcars, taking an average of thirty to forty days—well beyond the allotted one to two days—to unload them. As a result, demurrage and related charges totaling at least $365,730 accrued against GWSI.

The railcars at issue were used to transport tomato products from Morning Star's facility in California to GWSI's warehouse in Chester, Pennsylvania pursuant to a contract between Morning Star and GWSI. Upon arrival, the railcars remained at GWSI's warehouse until GWSI unloaded them. The shipments were received pursuant to GWSI's Standard Contract Terms and Conditions (the "Contract").

## II. LEGAL STANDARD

To survive a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. "Threadbare" recitations of the elements of a claim supported only by "conclusory statements" do not suffice. *Id*. Rather, a plaintiff must allege some facts to raise the allegation above the level of mere speculation. *Great W. Mining & Min. Co. v. Fox Rothschild, LLP*, 615 F.3d 159, 176 (3d Cir. 2010) (citing *Twombly*, 550 U.S. at 555).

In evaluating a motion to dismiss, the complaint must be construed "in the light most favorable to the plaintiff," with the question being "whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). Legal conclusions are disregarded, well-pleaded facts are taken as true, and a determination is made as to whether those facts state a "plausible claim for relief." *Id*. at 210-11.

A complaint must also be dismissed where, as a matter of law, "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)). Thus, dismissal under Rule 12(b)(6) is appropriate where the complaint is barred by a dispositive issue of law.

"In deciding a Rule 12(b)(6) motion, a court must consider only the complaint, exhibits

attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). Documents "integral to or explicitly relied upon in the complaint" may also be considered without converting a motion to dismiss into one for summary judgment. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted and emphasis removed).

## III. DISCUSSION

### A. Breach of Contract

Morning Star alleges that, under the Contract, "in exchange for payment from Morning Star, GWSI was responsible for the timely unloading, warehousing, and outbound shipment of Morning Star's goods." It alleges that GWSI breached that agreement twice: first, in 2024, "by failing to timely unload Morning Star's goods;" and again, in 2025, "by refusing to release and/or ship Morning Star's goods until Morning Star paid the demurrage charges which GWSI incurred from Norfolk Southern."

Morning Star seeks damages arising from those alleged breaches, including: (1) $29,656 to send trucks from California to remove its goods from GWSI's Pennsylvania warehouse; (2) $27,360 in delivery costs to remove the goods and relocate them to other warehouses in the region; (3) $16,332 in additional storage and disposal costs; (4) at least $20,000 for goods that had to be destroyed because their shelf lives expired; and, (5) $235,872 in projected revenue and growth from regional clients for the 2025-26 fiscal year.

GWSI characterizes all of these losses as consequential damages. Consequential damages are "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act." *Consequential Damages*, Black's Law Dictionary (12th ed.

2024). They may include "any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise." 13 Pa. C.S. § 2715(b). Neither party disputes, for purposes of the present motion, GWSI's characterization of Morning Star's claimed losses as consequential damages. The Court therefore treats them as such.

GWSI argues that Morning Star's recovery of those damages is foreclosed or limited by the parties' Contract. Section 11, titled "Liability and Limitation of Damages," provides that "damages are limited to $500.00 per package." Section 13, titled "Liability for Consequential Damages," further provides that GWSI "shall not be liable for any loss of profit or special, indirect, or consequential damages of any kind." Morning Star responds that such provisions are unenforceable.

Under Pennsylvania law,[2] contractual provisions "excluding liability for special, indirect and consequential damages in a commercial setting are generally valid and enforceable." *New York State Elec. & Gas Corp. v. Westinghouse Elec. Corp.*, 564 A.2d 919, 924 (Pa. Super. 1989). Indeed, "limitation of liability clauses are not disfavored under Pennsylvania law"; they allocate "unknown or undeterminable risks" and "are a fact of everyday business and commercial life." *Valhal Corp. v. Sullivan Assocs., Inc.*, 44 F.3d 195, 204 (3d Cir. 1995). Such a provision is enforceable "as long as the limitation which is established is reasonable and not so drastic as to remove the incentive to perform with due care." *Id*. Put differently, "[a]bsent unconscionability, limited liability provisions are binding on the parties that fashioned the terms of their agreement." *L & M Real Est. Devs., LLC v. Consol. Rail Corp.*, 328 A.3d 1068, 1075 (Pa.

---

[2] Section 21 of the Contract provides that: "[t]his Contract and the legal relationship between the parties hereto shall be governed by and construed in accordance with the substantive laws of the state Pennsylvania."

Super. 2024) (citing *Vasilis v. Bell of Pa.*, 598 A.2d 52, 54 (Pa. Super. 1991)); *Bemcy, LLP v. Gilead Scis., Inc.*, 2022 WL 3648186, at *4 (E.D. Pa. Aug. 24, 2022) ("[L]imitation of liability clauses are binding absent unconscionability.").

Morning Star's first argument against enforceability is, in substance, a prove-the-negative argument: it faults GWSI for not affirmatively showing that the contractual limitations are reasonable and do not remove its incentive to perform with due care. But the burden runs the other way. The party challenging a contractual provision on grounds of unconscionability generally bears the burden of proving that it is so. *See Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119-20 (Pa. 2007) ("The burden of proof generally concerning both elements [of unconscionability] has been allocated to the party challenging the agreement, and the ultimate determination of unconscionability is for the courts."). Thus, it is Morning Star that must identify a basis for declining to enforce the limitations to which it agreed.

Morning Star argues that, under GWSI's reading of Sections 11 and 13, "GWSI could take any action, intentional or negligent, and suffer no or minimal recourse for destroyed goods, for delayed goods, or for any other losses arising out of any conduct GWSI engaged in without the threat of consequence." In Morning Star's view, then, the limitations are so broad that they would leave GWSI with little meaningful incentive to perform its contractual obligations with due care. Neither provision goes that far.

Section 11, for one, merely places a $500-per-package ceiling on GWSI's liability. Morning Star argues that the $500-per-package cap "is far lower than the value of goods contained in the package and far lower than GWSI's anticipated compensation for receiving, unloading, and shipping the goods contained in each package." But "[l]iability limiting provisions may provide for damages significantly below actual foreseeable damages." *Lamb v.*

*CVS Pharmacy LLC*, 704 F. Supp.3d 606, 613 (E.D. Pa. 2023). Such provisions do not purport to estimate the actual harm caused by a breach; rather, they represent the parties' agreement in advance to place a ceiling on liability. S*ee* Restatement (First) of Contracts § 339 cmt. g. ("[T]he contracting parties can by agreement limit their liability in damages to a specified amount, either at the time of making their principal contract, or subsequently thereto. Such a contract does not purport to make an estimate of the harm caused by a breach; nor is its purpose to operate in terrorem to induce performance.").

*Adams v. Ryan & Christie Storage, Inc.*, 563 F. Supp. 409 (E.D. Pa. 1983) is illustrative. There, the plaintiff deposited with a warehouse "a substantial quantity of items for storage," including carpets "apparently of considerable value," but the parties' agreement limited the warehouse's liability to thirty cents per pound. *Id*. at 410. The court enforced that limitation, noting that the depositor could have obtained "a higher ceiling on liability" by paying an additional premium. *Id.* at 412-14. Morning Star had the same option here. Section 11 expressly provides that the $500-per-package limitation may "be increased upon Depositor's written request" in exchange for "an additional monthly charge." Its allegation that the goods may have been worth considerably more than $500 per package does not, without more, render the agreed-upon limitation unenforceable or demonstrate that it deprived GWSI of any meaningful incentive to perform with due care.

Section 13 fares no differently. Morning Star argues that the exclusion of consequential damages would leave GWSI with "no incentive to perform its obligations under the Agreement with due care," because GWSI would have "no concern for the consequences of an intentional or willful breach." But that argument overreads the provision. Section 13 does not purport to immunize GWSI from all liability; it excludes particular categories of damages—lost profits and

special, indirect, and consequential damages. Direct damages remain available to the extent otherwise recoverable, subject to any applicable contractual limitation. Nor does a contractual limitation necessarily insulate a party from liability for willful or wanton behavior. *See Valhal,* 44 F.3d at 203-04; *Valley Forge Con. & Visitors v. Visitor's Serv.*, 28 F. Supp.2d 947, 950 (E.D. Pa. 1998) ("While a limitation of liability clause may relieve the beneficiary of liability for the effects of his negligent conduct, it will not preclude recovery for damages caused by willful or wanton conduct."). Morning Star's suggestion that Section 13 leaves GWSI free to act however it pleases without consequence therefore rests on a premise the provision itself does not support.

Pennsylvania law, moreover, expressly recognizes contractual exclusions of consequential damages in commercial transactions. Section 2719 of Pennsylvania's Commercial Code provides that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable" and further specifies that, although limiting consequential damages for personal injuries involving consumer goods is prima facie unconscionable, "limitation of damages where the loss is commercial is not." 13 Pa. C.S. § 2719(c). Consistent with that principle, Pennsylvania courts have repeatedly enforced provisions nearly identical to Section 13. *See*, *e.g.*, *National Cash Register Co. v. Modern Transfer Co.*, 302 A.2d 486, 491 (Pa. Super. 1973) (enforcing provision stating that "[i]n no event shall NCR be liable for indirect, special, or consequential damages of any nature"); *Borden, Inc. v. Advent Ink Co.*, 701 A.2d 255, 262-65 (Pa. Super. 1997) (enforcing provision stating that "[i]n no event shall Seller be liable for incidental or consequential damages"); *Battle Born Munitions, Inc. v. Dick's Sporting Goods, Inc.,* 2019 WL 1978429, at *8 (W.D. Pa. May 3, 2019) (enforcing provision excluding "any punitive, special, incidental, or consequential damages of any kind" including lost profits, and dismissing claim for consequential damages and lost profits). Morning Star identifies no feature

of Section 13 that distinguishes it from those routinely enforced provisions. The Court therefore concludes that Sections 11 and 13 are enforceable and that Morning Star's recovery, if any, is subject to their terms.[3]

### B. Tort Claims

Morning Star also asserts claims against GWSI for tortious interference with contract and conversion, both arising from the same conduct—GWSI's alleged refusal "to release and/or ship Morning Star's goods until Morning Star paid the demurrage charges which GWSI incurred from Norfolk." Those allegations implicate two related but distinct acts: GWSI's refusal to *release* the goods and its refusal to *ship* them.

#### *i. Tortious Interference with Contract*

a. <u>Refusal to Release</u>

Morning Star's tortious interference with contract theory based on GWSI's refusal to release the goods fails on its own allegations because it cannot premise such a claim on GWSI's exercise of a contractual right to retain those goods. The Counterclaims establish that GWSI refused to release Morning Star's goods only until Morning Star paid its outstanding invoices, exclusive of the disputed demurrage charges.

The Contract gives GWSI a warehouse lien[4] securing those unpaid amounts. Section 19

---

[3] Morning Star also argues that the contractual limitations should not apply because "GWSI acted intentionally by refusing to release Morning Star's goods without justification with the intent to force – or, in other words, blackmail – Morning Star to comply with its baseless demands that Morning Star pay the demurrage fees incurred by GWSI due to GWSI's own failure to exercise reasonable care." *See Valley Forge Convention & Visitors Bureau*, 28 F. Supp.2d at 950 (citing *Valhal*, 44 F.3d at 203-04) ("While a limitation of liability clause may relieve the beneficiary of liability for the effects of his negligent conduct, it will not preclude recovery for damages caused by willful or wanton conduct."). But, as explained in Section B *infra*, Morning Star's own Counterclaims undermine that premise: they allege that GWSI did, in fact, have a contractual justification for retaining the goods due to Morning Star's failure to pay outstanding invoices.

[4] A "lien" is "[a] legal right or interest that a creditor has in another's property, lasting usu. until a debt or duty that it secures is satisfied." *Lien*, Black's Law Dictionary (12th ed. 2024).

provides that GWSI "shall have a general warehouse lien for all lawful charges for storage and preservation of the Goods," as well as "all lawful claims for money advanced, interest, insurance, transportation, labor, weighing, coopering, and other charges and expenses in relation to such Goods, and for the balance on any other accounts that may be due." The lien extends to "any other Goods stored by the [Morning Star] in any other facility owned or operated by Warehouse." And, "[i]n order to protect its lien, [GWSI] reserves the right to require advance payment of all charges prior to shipment of Goods." Thus, so long as Morning Star's ordinary invoices remained unpaid, the Contract entitled GWSI to retain Morning Star's goods pending payment.[5]

That contractual right defeats Morning Star's tortious-interference claim insofar as it rests on GWSI's retention of the goods. Such a claim requires, among other things, "the absence of privilege or justification on the part of the defendant." *Phillips v. Selig*, 959 A.2d 420, 428 (Pa. Super. Ct. 2008). Here, the Counterclaims themselves supply the justification that is otherwise missing: GWSI retained the goods to secure payment of outstanding charges pursuant to its warehouse lien. *See Skiff re Bus., Inc. v. Buckingham Ridgeview, LP*, 991 A.2d 956, 968 (Pa.

---

[5] Morning Star also asserts that GWSI "fails to set forth how it complied with the conditions precedent to have acted under Section 19 of the Agreement." But Morning Star neither identifies any language in Section 19 creating a condition precedent to GWSI's exercise of its lien nor explains how GWSI supposedly failed to satisfy one.

Likewise, Morning Star contends that GWSI acted in bad faith and that its warehouse lien should therefore be void. *See Cernica v. Wagner's Wheel Alinement, Inc.*, 27 Pa. D. & C.3d 678, 682 (Pa. Com. Pl. 1983) ("An attempt by a lien holder to assert a lien for an excessive amount in bad faith may constitute a conversion and void the lien, such as when the amount is greater than that actually owing or includes an amount for which no lien is entitled."). Yet Morning Star does not explain what conduct amounted to bad faith beyond its conclusory assertion. That omission is particularly notable given the Court's conclusion that GWSI's retention of the goods was authorized by the Contract's lien provision. Because Morning Star offers only conclusory assertions without developing either argument, both are forfeited. *See United States v. Heatherly*, 985 F.3d 254, 270 (3d Cir. 2021) (treating failure to "develop[ ] . . . arguments properly" as forfeiture); *see also Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion such as the one made here . . . will be deemed waived.").

Super. 2010) (holding that a lienholder was "justified in asserting [its] lien," thereby defeating a tortious-interference-with contract claim).

b. <u>Refusal to Ship</u>

Morning Star's separate reliance on GWSI's refusal to *ship* the goods fares no better because Morning Star fails to plausibly allege that GWSI lacked justification for declining to do so.

Morning Star alleges that GWSI was responsible under the Contract for the "outbound shipment" of Morning Star's goods and that, by failing to ship them after the parties' had negotiated their release, GWSI interfered with Morning Star's contracts with third parties. In support, Morning Star cites only generally to the Contract without identifying any provision imposing such an obligation. That omission is significant. *See*, *e.g.*, *Philidor Rx Servs. LLC v. Polsinelli PC*, 552 F. Supp.3d 506, 513 (E.D. Pa. 2021) ("To properly allege a breach of contract, a party needs to point at a specific provision of the document the counterparty breached.").

Nor, in the warehouse context, would an agreement to release the goods—which GWSI ultimately agreed to here—necessarily entail their shipment by the warehouse. In *Tremco, Inc. v. Banker*, the court described the "release" of goods under a warehouse contract's handling clause as their removal from storage and return to the loading dock, where the customer or its representative would haul them away. 1985 WL 11443, at *1 (Ohio Ct. App. Aug. 21, 1985) (explaining that the goods "were stored until a . . . customer or salesperson placed an order for their release," after which, "[t]he goods were then taken off the pallets and returned to the loading dock for the salesperson or customer to haul away"); *see also Orient Overseas Container Line v. John T. Clark & Sons of Bos., Inc.*, 229 F. Supp.2d 4, 10 (D. Mass. 2002) (explaining

that, upon execution of a release, the storage facility's practice was to move the goods "from the freezers to the loading dock," where the customer would collect them). It was the customer—not the warehouse—that would haul the goods away. Here, Section 6 of the parties' Contract, which governs handling, defines ordinary handling in nearly identical terms, including "receiving Goods at warehouse door, placing Goods in storage, and returning Goods to warehouse door."

The distinction between the obligations associated with release and shipment is also reflected in *CMPC USA, Inc. v. GWSI, Inc.* There, the allegations separately addressed access to warehoused goods, associated with their release, and their outbound shipment: GWSI was sued for its "refus[al] to ship . . . goods *in response to customer requests*." 2024 WL 4655416, at *5 (E.D. Pa. Nov. 1, 2024) (emphasis added). Shipment there thus involved an affirmative request that the warehouse send particular goods onward; it was not treated as merely part of the handling or release of goods under a warehouse agreement. Here, the Counterclaims do not allege the sort of affirmative request for outbound shipment present in *CMPC*—a customer request or other instruction that GWSI transport particular goods.

Morning Star's allegation that GWSI eventually agreed to release the goods but "nonetheless refused to ship" them therefore does not plausibly allege unjustified conduct. GWSI's refusal to provide a service that Morning Star has not alleged it was obligated to provide does not, without more, establish an absence of justification. *See Allen-Myland, Inc. v. Int'l Bus. Machines Corp.*, 746 F. Supp. 520, 557 (E.D. Pa. 1990) (finding defendant "privileged to refuse or justified in refusing" to provide a license where the parties "never entered a contract" requiring it, and similarly justified in refusing certification because plaintiff had "not established that [defendant] is obliged to certify").

***ii. Conversion***

Conversion "is the deprivation of another's right of property, or use or possession of a chattel, or other interference therewith without the owner's consent and without legal justification." *Prudential Ins. Co. of Am. v. Stella*, 994 F.Supp. 318, 323 (E.D. Pa. 1998) (citing *Universal Premium v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995)). GWSI argues that Morning Star's claim for conversion is barred by the gist of the action doctrine.

"Under Pennsylvania law, the gist of the action doctrine prevents a purely contractual duty from serving as the basis for a tort claim." *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 216 (3d Cir. 2022) (citing *Bruno v. Erie Ins. Co.*, 106 A.3d 48, 65 (Pa. 2014)). Put differently, the doctrine precludes plaintiffs from "re-casting ordinary breach of contract claims into tort claims." *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002). In the context of conversion, "[w]here the success of a conversion claim depends entirely on the [parties'] obligations as defined by a contract, the gist of the action doctrine applies." *Conquest v. WMC Mortg. Corp.*, 247 F. Supp.3d 618, 646 (E.D. Pa. 2017) (quoting *Patel v. Patel*, 2016 WL 3000821, at *4 (E.D. Pa. May 25, 2016)).

That is the case here. Morning Star alleges that GWSI converted its property when it "refused to release and ship Morning Star's goods until Morning Star paid GWSI for the full invoices." Whether GWSI wrongfully deprived Morning Star of the use or possession of its property cannot be determined independently of the parties' contractual rights and obligations. As to retention, the Contract defines the scope of GWSI's warehouse lien and, accordingly, whether GWSI was entitled to continue possessing the goods pending payment. As to shipment, Morning Star itself characterizes GWSI's asserted obligation to ship the goods as one arising under the Contract.

Thus, the conversion claim is merely a repackaging in tort of the parties' contractual dispute. *See Foley v. DeFi Strategies, LLC*, 2023 WL 12253857, at *3 (E.D. Pa. Sept. 22, 2023) (dismissing a conversion claim where "the plaintiffs' claims are based entirely on contracts between the parties"); *Nationstar Mortg. LLC v. Radian Guar. Inc.*, 2019 WL 1318541, at *5 (E.D. Pa. Mar. 22, 2019) ("The gist of the action doctrine bars conversion claims where 'the success of [the claim] is wholly dependent on the terms of the contract.'") (quoting *Alpart v. Gen. Land Partners, Inc.*, 574 F. Supp.2d 491, 506 (E.D. Pa. 2008)). Morning Star's own allegations reinforce that conclusion: in pleading the damages attributable to its conversion claim, it alleges that "[a]s a direct and proximate result of GWSI's *breach of contract*, Morning Star incurred a loss of at least $20,000.00 in goods which had to be destroyed due to the expiration of their relevant shelf lives." (emphasis added). Accordingly, the gist of the action doctrine precludes Morning Star proceeding on its conversion claim.[6]

An appropriate order follows.

**BY THE COURT:**

**S/ WENDY BEETLESTONE**

______________________________

**WENDY BEETLESTONE, C.J.**

[6] Morning Star seeks punitive damages based on its tort claims against GWSI. Because both tort claims will be dismissed, the Court need not reach GWSI's separate argument that the corresponding requests for punitive damages should likewise be dismissed.